UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 1:08-cr-93 |
| v. | ) | *Collier / Lee* |
| | ) | |
| LEKELFORD BOHANON | ) | |

## REPORT AND RECOMMENDATION

### I.     Introduction

Defendant, Lekelford Bohanon, after being charged in a one count indictment with possession with intent to distribute 500 grams of cocaine, filed a motion to suppress evidence resulting from a traffic stop [Doc. 9]. The United States filed a response in opposition to the motion [Doc. 12]. The motion was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) [Doc. 10]. An evidentiary hearing on the motion was held December 18, 2008. Subsequently, the parties completed supplementation of the record and filed post-hearing briefs [Doc. 15 & 16], and this matter is now ripe for decision. As set forth herein, I **RECOMMEND** that Defendant's motion be **GRANTED IN PART and DENIED IN PART** as follows: 1) the aspect of Defendant's motion which seeks to suppress his incriminating statements should be **GRANTED** and 2) all other aspects of the motion should be **DENIED**.

### II.     Evidence

At the evidentiary hearing, the United States offered the testimony of Agent Mike Patterson ("Patterson") of the Tenth Judicial Drug Task Force ("DTF"). Defendant presented no witnesses.

#### A.     Testimony of Patterson

Patterson testified as follows: Patterson has been an agent with the DTF since August of

2007 and in law enforcement since January of 2005. He is assigned to highway drug and contraband interdiction and he has been specially trained in that regard. His interdiction training includes a focus on the movements of vehicles and occupants, not vehicle types. He is also a trained canine handler. Although Patterson's drug-detection dog was in his patrol car during the stop at issue, he did not deploy his dog at any time.

On the afternoon of April 10, 2008, Patterson was in a stationary position in a marked patrol car working highway interdiction on Interstate 75 near Cleveland, Tennessee. Around 4:55 p.m., Patterson used his permanent mount radar equipment, which he is trained to use and calibrate, to clock the speed of a blue Chevrolet Tahoe that appeared to be traveling in excess of the posted speed limit of 70 m.p.h. Patterson keeps no records regarding his calibration and use of the radar equipment, but he calibrates the equipment for each use. Based on the radar equipment, Patterson determined the Tahoe was traveling 76 m.p.h. in a 70 m.p.h. zone.

Pursuant to his training, prior to activating his blue lights Patterson pulled alongside of the Tahoe to observe whether there were passengers in the vehicle for officer safety reasons. During the time Patterson drove alongside the Tahoe, Patterson observed Defendant was the driver and sole occupant of the Tahoe. Patterson also observed Defendant lock his arms back and refuse to make eye contact as the two vehicles drove alongside each other. During the time the vehicles were traveling together, the Tahoe's speed was reduced and within the speed limit. Patterson then pulled behind the Tahoe and activated his blue lights to conduct a traffic stop for traveling 76 m.p.h. in a 70 m.p.h. zone. Defendant's speed was the only suspicious thing about his driving. For interdiction purposes, however, Defendant's "criminal indicators" were his speed and his reaction to Patterson, *i.e.*, the locked arms and refusal to make eye contact.

2

Upon activation of the blue lights, Defendant immediately pulled over. After Defendant stopped, Patterson approached the vehicle from the passenger's side for officer safety reasons. As Patterson approached the Tahoe, he noticed Defendant was moving around or "fidgeting" in a nervous manner. Defendant lowered the driver's side and passenger's side windows and Patterson put his head through the passenger window to hear Defendant. When Patterson leaned into the Tahoe to hear Defendant, he smelled an odor of marijuana in the vehicle. Patterson was able to see Defendant's heartbeat on Defendant's chest, which Patterson considered to be another sign of nervousness. At the time, Patterson thought Defendant was nervous because he was speeding and might possess marijuana based on the odor coming from the Tahoe. At Patterson's request, Defendant presented his driver's license, stating it was valid. He did not have his registration, but he did present a bill of sale for the vehicle. When asked if he had ever been arrested before, Defendant disclosed only that he had been arrested for driving under the influence ("DUI").

Patterson returned to his patrol car and called the Blue Lightning Operations Center ("BLOC") to "run" Defendant's name and license. Patterson called BLOC because he wanted to obtain an instant roadside criminal activity history on Defendant, which is something the local police dispatcher could not provide, in addition to Defendant's license and registration information. The BLOC agent ran the report instantly and reported Defendant had a prior arrest on fleeing, assault, and narcotics charges. The parties stipulated Defendant had no arrests or convictions for weapons charges on his record. The BLOC agent did not report Defendant was considered dangerous. Patterson also learned from the BLOC agent that Defendant's license and registration were valid. Patterson did not learn how the fleeing, assault, and narcotics charges were resolved because the BLOC agent stated he had a computer problem and would have to call Patterson back. Patterson

3

expected the call back on his cell phone, not the radio. After learning the above information from BLOC and due to his concern about Defendant's criminal history and the odor of marijuana, Patterson decided to investigate further. He used his radio to call for backup. Patterson believed Defendant's prior fleeing and assault charges made Defendant dangerous. He believed the smell of marijuana was probable cause for a search and arrest and did not believe it was necessary to use his canine in his further investigation. Patterson did not receive a call back from BLOC before his next interaction with Defendant, and he accidently left his cell phone behind when exiting his patrol car. Patterson did not explain when, if ever, he received a call back from the BLOC agent.

Patterson approached Defendant and asked him to step out of the vehicle for officer safety, to prevent a drive off, to "lower nervousness," and to facilitate communication and observation. Defendant and Patterson stepped to the rear of the vehicle to speak. Defendant asked if he was in trouble and Patterson replied "no." Defendant was using or had a cell phone in his hand, which Patterson asked him to turn off. Patterson kept eye contact with Defendant as Defendant lowered the phone and he did not see where Defendant put the phone. Patterson asked Defendant about the charges he had not disclosed, *i.e.*, the charges in addition to the DUI, and Defendant replied he had drug charges in the past. Patterson asked if Defendant had any personal use narcotics or "anything" in his vehicle and Defendant denied he did. Patterson then asked for consent to search the vehicle, which Defendant denied. Patterson asked for consent to search because he thought Defendant continued to display nervous body movements and Patterson also noticed Defendant's eyes were bloodshot. Patterson thought this might be the result of marijuana or other narcotic use.

For officer safety, Patterson then asked for permission to conduct a patdown and Defendant questioned this request, stating he had no weapons. Patterson had an officer safety concern in part

because when he asked Defendant to exit the Tahoe he noticed the Defendant's left hand was near a door compartment that was large enough to possibly conceal a weapon and Defendant kept moving his hand. Without explaining further or obtaining permission from Defendant for the patdown, Patterson conducted an external patdown for officer safety reasons. When examined about whether he thought Defendant had a weapon, Patterson said it was "unknown" at that point. Patterson felt something in Defendant's left pocket, which Defendant said was money and Patterson accepted that explanation. Then Patterson felt one unknown hard object and a probable plastic baggie with something in it in Defendant's right front pocket. Patterson was not sure whether the hard object was a weapon or cell phone, but he thought it might be a weapon. Patterson asked what was in the pocket and Defendant said a cell phone. Patterson then rapidly commanded Defendant to remove all objects from his pocket several times and, for officer safety and in accordance with standard operating procedure when a possible weapon is detected, Patterson drew his taser.

In response to Defendant's commands to empty his pocket, Defendant removed a cell phone but kept "digging" in his pocket. On direct, Patterson said he was still concerned there might be a weapon in Defendant's pocket. On cross examination, Patterson agreed he knew there were no other hard objects in the pocket. Patterson ordered Defendant to remove all objects from his pocket by turning it inside out. In response, Defendant removed a baggie, which had a green plant like material Patterson thought was marijuana, from his pocket. Upon seeing the marijuana, Patterson ordered Defendant to get on the ground. His intention was to detain Defendant and investigate further.

In response, Defendant turned and "started to flee" toward traffic and his vehicle. Patterson used his taser weapon on Defendant causing Defendant to fall incapacitated into the right hand lane

of the roadway. As Defendant lay in the highway a tractor trailer passed within a few inches of Defendant's head and upper body. Patterson ordered Defendant to get up and move to the side of the highway. Because Defendant reached for the baggie containing marijuana, which had fallen on the road, Patterson tased him again causing him to fall toward his vehicle. Patterson told Defendant to roll to the back of the vehicle. When Defendant tried to stand, he moved as if to attempt to flee again. Patterson told Defendant to get down on the ground and tased him again for not complying. Defendant fell face first onto the ground. When Defendant again attempted to get up despite a command from Patterson to stay on the ground, Patterson tased Defendant another time.

Officer Ratcliff ("Ratcliff"), who had arrived during this encounter, attempted to handcuff Defendant. Defendant initially complied with the directive to put his hands behind his back by placing his left hand behind him. Defendant started to comply with his right hand, but then pulled it away. Patterson then deployed his final taser shock, after which Defendant fully complied and was handcuffed. Ratcliff moved Defendant out of the roadway and into the emergency lane.

It was not until after Defendant was handcuffed that Patterson determined Defendant had no weapon on him. Patterson estimated the time from the stop until Defendant was in handcuffs was less than ten minutes. In all, Patterson deployed his taser on Defendant six times. He said each use was based on Defendant's failure to comply with his orders.

Once Defendant was in handcuffs, Patterson asked Defendant why he had tried to run. Defendant said he did not. Patterson responded, "it's on camera fool." Patterson told Defendant to turn over and not talk. After Defendant turned over, he turned back and said, "I got dope in the car man." Patterson then asked what was in the car, and Defendant said "drugs."[1]

---

[1] These are the statements Defendant seeks to suppress.

Ratcliff searched the Defendant's vehicle and found a kilo of cocaine in the front center console. The only marijuana discovered was in the sandwich baggie in Defendant's pocket, which contained a small personal use amount of raw marijuana.[2] There was no evidence of burnt marijuana, such as matches, ashes or "roaches," in Defendant's vehicle or on his person. There was also no evidence of raw marijuana, such as loose leaves, in the Tahoe. No weapons were located in the Tahoe.

Patterson was asked whether he smelled "burnt" or "raw" marijuana upon sticking his head in Defendant's vehicle at the beginning of the stop. During the suppression hearing, Patterson said he smelled raw marijuana. On cross examination, Patterson admitted he testified in an earlier state court proceeding held April 29, 2008, that he smelled burnt marijuana. Patterson testified that his affidavit was more accurate than his state court testimony because the affidavit was prepared April 10, 2008 within 30 minutes of Defendant's transport to the jail. Patterson testified his affidavit says he smelled raw marijuana so he must have been confused at the earlier state court proceeding when he said he smelled burnt marijuana. Actually, the affidavit does not describe the marijuana odor as either raw or burnt. Patterson agreed his affidavit should be, and was, accurate and that it contained all of the important facts, observations, and actions concerning the events at issue. According to Patterson, his affidavit was prepared when his memory was at its freshest concerning the details of the stop.[3]

Patterson was not familiar with research regarding a human's ability to smell marijuana. Patterson said he is very sensitive to the smell of marijuana and is also familiar with masking agents

---

[2] A photograph of the marijuana was introduced as an exhibit to the hearing.

[3] A copy of Patterson's affidavit was introduced as an exhibit to the hearing.

that attempt to cover the smell, such as diesel fuel. He acknowledged many vehicles traveling on the interstate use diesel fuel. Patterson also testified he knows marijuana when he sees it. Patterson acknowledged he was "nervous" and "overwhelmed" after Defendant fell into the highway and nearly lost his life to the passing tractor trailer.

### B. The Recorded Evidence

When Patterson activated the blue lights on his patrol car, Patterson's dashboard recording equipment began recording. At the Court's request, the parties submitted an agreed transcript of the dialogue heard on the recording [Doc. 16-2], noting three portions of the transcript, which are highlighted herein, where an agreement was not reached by the parties regarding what was said by Defendant. As to the three portions of the transcript where the parties did not reach agreement on what was said, it is not necessary to make specific findings concerning exactly what was said at this time. Instead, at issue is whether whatever was said by Defendant should be suppressed.

The recording of the stop[4] shows Defendant's vehicle pulling over at 00:15 on the DVD timer. The recording shows Defendant turned toward his car prior to Patterson's initial use of the taser and shows multiple uses of the taser by Patterson on Defendant over the course of several minutes. After the first use of the taser, Defendant fell into the interstate where a tractor trailer narrowly missed running over him. Consistent with the testimony, the recording reflects a tense and rapid fire encounter from the moment Patterson engaged in a patdown of Defendant.

As Patterson initially approached Defendant's vehicle from the passenger's side, around

---

[4] A DVD containing video footage and some audio recording of only the first ten-minute segment of the stop and search was admitted into evidence at the hearing as Government Exhibit 1. Upon agreement of the parties, a supplemental DVD, which contains an additional four ten-minute segments of the recorded events, was admitted post-hearing as Defendant's Exhibit 3. For this report and recommendation, all five ten-minute segments of recorded evidence were reviewed.

00:32 on the segment of the DVD labeled DTF3_APR.10.2008_16:57:58, the following dialogue begins:

Patterson:     Hey Buddy, how are you doing, bud?  Is this your car?  Do you have your driver's license and registration with you? You doing okay today?

Patterson:     Trying to look at your tires.  Did you have your cruise on or anything when you came by?

Defendant:     No.

Patterson:     You didn't?  Okay.  I shot you at 76.  I'm not going to write you a ticket or anything, but, I looked at your tires, they look a little bit bigger.  Is this four wheel drive, or two wheel?

Defendant:     Two wheel.

Patterson:     Okay.

Defendant:     They told me like if I (inaudible)

Patterson:     Okay.  Where you coming from today?

Defendant:     I was (inaudible) Chattanooga.

Patterson:     Chattanooga?

Defendant:     Headed back to Knoxville.

Patterson:     Headed back home now?

Defendant:     Yeah.

Patterson:     Okay. How long have you had the vehicle?

Defendant:     Like September.

Patterson:     Okay.  No problems with your license, or anything?  You ever been arrested,

anything like that?

Defendant: Yeah, I've been arrested.

Patterson: What have you been arrested for?

Defendant: DUI.

Patterson: DUI? Your license and (certificate?) are good now?

Defendant: Yeah.

Patterson: Okay. I'm going to go back and check on your (tags) and vehicle, okay?

Defendant: Yeah.

At approximately 01:59, Patterson returned to his vehicle to check Defendant's information, and the audio portion of the recording stops, but the picture remains starting at 02:00. According to the testimony, during at least a portion of this silence Patterson was speaking to BLOC and calling for backup. The audio is reactivated and Patterson returns to Defendant's vehicle around 05:47, and the dialogue continues:

Patterson: Step back here with me for a second, okay? Come on back here with me just a minute.

Patterson: I'm sorry?

Defendant: Am I in trouble?

Patterson: No, just come on back here for just a second.

Patterson: Okay. I had to run your license . . . could you cut that off for me, please? I had to run your license by phone, had a problem getting 'em back. So I'm waiting on that stuff to come back, okay? There's some criminal history, though, other than a DUI. What all is that?

| | |
|---|---|
| Defendant: | I got drugs, a domestic, and stuff. |
| Patterson: | Okay. You got anything on you now at all? No personal use? Nothing inside the vehicle? |
| Defendant: | No. |
| Patterson: | Do you have any problem if I search your vehicle? |
| Defendant: | I mean I got a problem, but I don't understand why I'm getting searched. |
| Patterson: | Okay, I understand. You mind if I pat you down for weapons, or anything? |
| Defendant: | I don't have any weapons, man. |
| Patterson: | Okay, I'm just going to touch your pockets, okay? |
| Defendant: | Ain't nothing but my money. |
| Patterson: | That's fine, no big deal. What's that? |
| Defendant: | That's uh . . . my cell phone. |
| Patterson: | Pull it out. Pull it, pull it all out. Pull it out. Put it all out, partner. I'm going to pop you with it. No, there's more, empty your pocket, turn it inside out, empty your pocket, or I'm going to hit you with the taser. |
| Defendant: | There's nothing. |
| Patterson: | I know it. Get on the ground! Get on! (to radio) DTF5, start me another unit. I've got one on the ground. |
| Patterson: | I'm going to hit you again. This way! This way! Get out of the road! Don't touch that weed! |
| Defendant: | Oh, God Dammit. |
| Patterson: | Stay down! |

11

| | |
|---|---|
| Defendant: | Ohhh, I can't move. |
| Patterson: | Roll to the back of the car or I'll hit you again.  Roll to the back of the car. |
| Defendant: | No, please man. |
| Patterson: | Roll to the back of the car! |
| Defendant: | ==Why'd you stop for?== |
| | ==-OR-== |
| | ==No.  I'm getting up (inaudible) for . . .== |
| Patterson: | Get down!  Get on the ground now!  Get on the ground! |
| Defendant: | No, please, don't |
| Patterson: | Get on the ground!  Stay down! |
| Defendant: | Why'd you? |
| Patterson: |  Stay down, or you're going to get it again, partner! |
| Defendant: | I'm doing it.  I'm staying down. |
| Patterson: | Stay down!  Please stay down! |
| Ratcliff: | Roll over. |
| Patterson: | Turn over, now, or I'm going to hit you again. |
| Ratcliff: | Roll over! |
| Defendant: | I can't move. |
| Ratcliff: | Roll over onto your stomach.  Do it now. |
| Patterson: | I'm going to hit you again. |
| Ratcliff: | Roll over.  Put your hands behind your back. |
| Patterson: | DTF5, I've got 30, city, here with me.  We've got him in custody. |

12

| | |
|---|---|
| Ratcliff: | Put your hands behind your back. Put your hands behind your back. Put your hands behind your back. Do you want some more of it? |
| Defendant: | No. |
| Ratcliff: | Put your hands behind your back! |
| Patterson: | Do not move. |
| Defendant: | What'd I do? |
| Ratcliff: | Put your hands behind your back! |
| Defendant: | I can't, I'm sto. . . |
| Ratcliff: | Do not move. |
| Patterson: | (to Ratcliff) he hit his head when he fell two times. |
| Defendant: | <mark>What was the reason for pulling me over?</mark> <br> <mark>-OR-</mark> <br> <mark>I was reaching to pull it out.</mark> |
| Ratcliff: | Do not move. Stay right there. |
| Patterson: | I explained that to you. Stay down. Turn yourself over, don't make this any worse for you, turn over. Turn over. |
| Defendant: | What was the reason? |
| Patterson: | Turn over. Why were you going to try to run? |
| Defendant: | I wasn't. |
| Patterson: | It's on video, fool. |
| Defendant: | I wasn't. |
| Patterson: | Turn over, and just don't talk, ok? |

| | |
|---|---|
| Defendant: | Why'd you shoot me, man? |
| Patterson: | I told you, you tried to take that weed and take off on me. Just turn over, ok? |
| Defendant: | Why was you pulling me over? |
| Patterson: | Partner, turn over. I explained that to you. I'm not going to argue, I'm going to hit you again with the taser, if you don't turn over. |
| Defendant: | ==I got something in the car, man.== |
| | ==-OR-== |
| | ==I have dope in the car, man.== |
| Patterson: | What's in there? |
| Defendant: | Drugs. |
| Patterson: | Ok, listen, I don't want to be hard on you, partner. (To Officer Ratcliff) He's got some dope in here, he's already told me, in the car. (To Defendant) Turn back over. Turn back over. Turn back over. |
| Defendant: | I can't (inaudible) man, I can't (inaudible) them . . . |
| Patterson: | Turn over. |
| Defendant: | Let me go man. Whew! |
| Patterson: | (To radio) DTF5, contact the office, have DTF2 en route to my location. (To Ratcliff) Andy, gonna be back in the back. |
| Defendant: | I didn't do nothing. |
| Patterson: | (To Ratcliff) Right there. (To radio) DTF5, you copy? Contact our office, have DTF2 signal 8. |
| Defendant: | Would you get me up please? |

14

| | |
|---|---|
| Patterson: | Not yet.  Down. |
| Defendant: | I can't . . . |
| Patterson: | I'm going to hit you again, partner.  Turn over. |
| Patterson: | Where's the dope in there? |
| Defendant: | Why was you searching me for? |
| Patterson: | I didn't search you.  I asked you for consent and you pulled that weed out of your pocket. |
| Defendant: | I said, no, I wouldn't consent. |
| Patterson: | Yeah, that's right, but now you got a problem when you turned and walked away from me.  Where the dope at in there? |
| Defendant: | Don't have nothing. |
| Patterson: | Huh? |
| Defendant: | That was it. |
| Patterson: | No. (To Ratcliff) Andy, check the console too.  (To Defendant) Turn over there partner . . . uh, uh. |
| Patterson: | (To radio) Got one on the ground been tased.  Just need you signal 8 here. |

Beginning at 00:01 on the second ten-minute segment recording, which is on the DVD labeled DTF3_APR.10.2008_17:07:58, the following dialogue is heard :

| | |
|---|---|
| Defendant: | Oh man, can I get up, please? |
| Patterson: | No, partner.  I'm going to hit you again.  Stay down or I'm going to hit you again. |
| Defendant: | I can't breathe. |
| Patterson: | Don't move. |

Ratcliff:       Kilo of coke.

Patterson:      Okay.  (To radio) DTF2, copy?

DTF2 (Unidentified male on radio):  Yeah.  Where you at on (inaudible)?

Patterson:      (To unidentified uniformed officer) Can you hold him here at taser point?  I got a

                kilo of cocaine and some money.  (To Defendant) What's this? (To radio) DTF5,

                DTF2?  DTF5 DTF2?  (To unidentified officer) Got a kilo.

        There is again silence from about 00:44 until 01:18, when the following is heard:

Defendant:      You had no reason for pulling me over.

Patterson:      We'll talk about that in court . . . See that on the hood?

        Around 00:28, a bag with the suspected kilo of cocaine, is removed from Defendant's vehicle

and placed on the hood of Patterson's patrol car.  At 01:55, Defendant is removed from the area of

the scene captured by the visual recording equipment.  Around 05:44, the suspected kilo of cocaine

package is taken back to the Defendant's vehicle by one officer while another officer carries a

camera to the vehicle.  Around 06:57 the officer returns the suspected cocaine to the hood of

Patterson's patrol car as the other officer with the camera walks back from the Defendant's vehicle.

At 08:08, an officer appears to pull a small tube or straw from the bag containing the alleged

cocaine. The officers continue to appear on the remaining DVD segments as they appear to look for,

photograph, and examine the evidence without further audio.  The three remaining segments of the

recording include additional footage of the officers with very limited audio concerning the medical

condition of Defendant.

## III.  Analysis

        Defendant's motion involves a non-consensual, investigative detention.  *See United States*

*v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997). Based on the issues raised in Defendant's motion, the initial stop of Defendant's vehicle, the detention of Defendant, the subsequent search of Defendant and the vehicle, and the statements made by Defendant are all acts or events which must be separately considered. *See United States v. Bentley*, 29 F.3d 1073, 1075 (6th Cir. 1994).

### A. Legitimate Expectation of Privacy

As an initial matter, a defendant generally has the burden of establishing a legitimate expectation of privacy to assert a Fourth Amendment right. *Rakas v. Illinois*, 439 U.S. 128, 134 (1978)*; United States v. Smith*, 263 F.3d 571, 582 (6th Cir. 2001). A defendant must also demonstrate a search and the resulting evidence were the product of that defendant's illegal detention. *See Segura v. United States*, 468 U.S. 796, 815 (1984). In the instant matter, it is undisputed Defendant has a legitimate expectation of privacy to contest the legality of the stop and detention and to suppress the fruits of any illegal seizure.

### B. Stop

The United States argues Defendant was properly stopped for the civil traffic infraction of speeding pursuant to Tenn. Code. Ann. § 55-8-152. Defendant argues there was no probable cause to stop Defendant. While Defendant argues there is insufficient credible evidence he was speeding, he does not contest that driving 76 m.p.h. in a 70 m.p.h. zone is a civil traffic infraction pursuant to Tenn. Code. Ann. § 55-8-152.

The United States Court of Appeals for the Sixth Circuit ("Sixth Circuit") "has developed two separate tests to determine the constitutional validity of vehicle stops: an officer must have probable cause to make a stop for a civil infraction, and reasonable suspicion of an ongoing crime to make a stop for a criminal violation." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008).

Probable cause is a reasonable ground for belief supported by less than *prima facie* proof but more than mere suspicion. *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 2436 (2007). The police may lawfully detain a vehicle and conduct a brief stop of its occupant where there is probable cause to believe a traffic violation has occurred, even if the traffic offense is minor and the officer had additional subjective reasons for making the stop. *Whren v. United States*, 517 U.S. 806, 813 (1996); *United States v. Herbin*, 343 F.3d 807, 809 (6th Cir. 2003). A court must evaluate the proffered basis for a stop against the standard of whether it was objectively reasonable, given the totality of the circumstances. Describing the perspective from which a reviewing court should evaluate a law enforcement officer's determination of probable cause when making a traffic stop, the Sixth Circuit has held "all probable cause determinations [are] fact-dependent and will turn on what the officer knew *at the time he made the stop*." *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (emphasis in original).

Patterson testified he used his radar equipment to "clock" Defendant speeding. While putting it somewhat more delicately, Defendant essentially argues the evidence of speeding is not credible and Patterson had no legal basis for the stop. As there is no evidence to suggest that preparing or keeping radar calibration records is required or even typical, Defendant's arguments about Patterson's failure to keep such records does not call into question the veracity of his credible testimony about his observation of the Defendant's traffic infraction. Patterson can clearly be heard on the DVD advising Defendant he was going 76 m.p.h., which Defendant does not deny at that time. Although Defendant can be heard on the recording questioning why he was pulled over and saying he did nothing wrong as the stop progresses, he did not deny he was speeding when he was initially informed of the basis for the stop. Defendant presented no evidence during the hearing –

other than his reliance on the recording – to refute Patterson's testimony that he was speeding.

Patterson never wavered in his testimony that he personally clocked the Defendant's vehicle speeding. Patterson's testimony is corroborated by the DVD where he specifically mentions the speeding to Defendant and by his affidavit, which states he used his radar equipment to clock Defendant's speeding. While there were some inconsistencies in Patterson's testimony (and there was no explanation provided by Patterson for his arguably questionable practice of turning off the audio portion of the recording equipment at times), the inconsistencies in Patterson's testimony discussed herein do not indicate Patterson fabricated speeding as an after-the-fact justification for the stop.

I **FIND** the United States has met its burden of establishing the necessary probable cause for the initial stop and that the proffered basis for the stop is objectively reasonable given the totality of the circumstances.

### C. Detention

When a vehicle is lawfully stopped, as in the instant matter, an officer may request a driver's license and vehicle registration from the driver. *See Berkemer v. McCarty*, 468 U.S. 420, 437 (1984); *United States v. Hill,* 195 F.3d 258, 269 (6th Cir. 1999). The occupant of a vehicle may be detained until after the officer has finished verifying the driver's license, checking other records, and issuing a citation, as these acts are within the purpose of the initial stop. *See United States v. Wellman*, 185 F.3d 651, 656 (6th Cir. 1999); *United States v. Bradshaw*, 102 F.3d 204, 212 (6th Cir. 1996). Detention of a suspect until the completion of records checks regarding the vehicle and driver and the issuance of a citation for a traffic violation are "well within the bounds of the initial stop." *Bradshaw*, 102 F.3d at 212.

19

The Supreme Court recently confirmed "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop do not convert the encounter into something other than a lawful seizure, so long as the inquiries do not measurably extend the stop's duration." *Arizona v. Johnson*, __ S. Ct. __, 2009 WL 160434, *7 (U.S. January 26, 2009); *accord United States v. Burton*, 334 F.3d 514, 518-19 (6th Cir. 2003); *United States v. Ellis*, 497 F.3d 606, 613-14 (6th Cir. 2007); *Hill*, 195 F.3d at 268. It is also well established an officer may continue to question a driver while license checks are being performed. *United States v. Perez*, 440 F.3d 363 (6th Cir.), *cert. denied*, 549 U.S. 1014 (2006).

It is well settled the police may stop a vehicle for a traffic infraction, but detention beyond the scope of the initial stop requires reasonable suspicion of criminal activity. *Terry v. Ohio*, 392 U.S. 1, 20 (1968) (the degree of intrusion must be "reasonably related in scope to the circumstances which justified the interference in the first place"); *Bradshaw*, 102 F.3d at 212 ("some additional suspicious activity is necessary to justify further detention beyond the scope of the original [traffic] stop"); *Perez*, 440 F.3d at 370 (once the purpose of the traffic stop is completed, officers "may not 'further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention.'") (quoting *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995)). "Under the Fourth Amendment, even the briefest of detentions is too long if the police lack a reasonable suspicion of specific criminal activity." *United States v. Urrieta*, 520 F.3d 569, 578 (6th Cir. 2008). Generally, if a detention exceeds its proper scope, then any evidence seized during the illegal detention must be suppressed as fruit of the poisonous tree. *Hill*, 195 F.3d at 264. However, detention may continue after a routine traffic stop is completed if the officer has a reasonable suspicion criminal activity is afoot. *United States v.*

*Garrido-Santana*, 360 F.3d 565, 571 (6th Cir. 2004); *Hill*, 195 F.3d at 264.

Reasonable suspicion is more than a hunch but "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Based upon the totality of the circumstances, "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981); *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (reasonable suspicion must be supported by specific articulable facts). Reasonable suspicion must be determined by "commonsense judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). A court should give "due weight" to the "specific reasonable inferences which [the officer] is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S. at 27.

Detention is reasonable if it is "sufficiently limited in time" and "the investigative means used are the least intrusive means reasonably available." *Bennett v. City of Eastpointe*, 410 F.3d 810, 825-26 (6th Cir. 2005). In *United States v. Sharpe,* 470 U.S. 675, 686 (1985), the Supreme Court held that in assessing whether a detention is too long in duration to be justified as an investigative stop, it is proper to examine whether the police diligently pursued a means of investigation likely to confirm or dispel their suspicions quickly. Thus, the focus is on the diligence of the police and is not on the length of the detention. *United States v. Calderon-Valenzuela*, Nos. 98-4353, 98-4355, 2000 WL 571953, *4 (6th Cir. May 3, 2000).

The pivotal issue is whether the scope and duration of the detention transformed the legal traffic stop for speeding into an unconstitutional seizure. Before turning to the issue of reasonable suspicion to support detention beyond the purpose of the stop here, the proper scope and duration

of the traffic stop must be determined. A dispute exists about when the purpose of the traffic stop ended and further detention based on alleged reasonable suspicion of criminal activity began. Defendant contends the purpose of the initial stop was completed as soon as Patterson learned from BLOC that the Defendant's license and registration were valid since Patterson had already decided not to issue a citation for speeding. Thus, Defendant contends the detention was unlawful beginning at the time Defendant was asked to step out of the vehicle even if the original stop is determined to be lawful. The United States contends the purpose of the stop was never concluded before the Defendant's arrest because the BLOC agent had not completed his report to Patterson due to the BLOC computer problems. Given Patterson testimony that he intended to investigate further based upon reasonable suspicion after the records check was completed to the point of verifying the driver's license and registration information, I **FIND** the purpose of the stop was completed at the time Patterson returned to the Defendant's vehicle as argued by the Defendant.

Turning to the issue of reasonable suspicion, the failure to intend to issue a citation for the speeding violation is legally irrelevant since "continuing to detain a motorist does not become unlawful just because the officer has determined in his own mind not to pursue the traffic violation." *United States v. Herbin*, 343 F.3d at 810 (citing *Ohio v. Robinette*, 519 U.S. 33, 38 (1996)). "Although nervousness may be considered as part of the overall circumstances giving rise to a reasonable suspicion, [the Sixth Circuit] has found nervousness inherently *unsuspicious,* and has therefore given it very limited or no weight in the reasonable-suspicion calculation." *Urrieta*, 520 F.3d at 577 (emphasis in original) (citing *United States v. Richardson*, 385 F.3d 625, 630-31 (6th Cir. 2004); *United States v. Andrews*, 600 F.2d 563, 566 (6th Cir. 1979)). Thus, while Defendant's nervous behavior has been considered herein as part of the totality of the circumstances, his

nervousness has been accorded minimal significance in calculating reasonable suspicion. However, as argued by the United States, the Sixth Circuit has repeatedly held the detection of a narcotic odor from within a vehicle is sufficient probable cause to search the vehicle without a warrant. *See e.g., United States v. Foster*, 376 F.3d 577, 589 (6th Cir. 2004); *United States v. Garza,* 10 F.3d 1241, 1246 (6th Cir. 1993); *United States v. Puckett*, 422 F.3d 340, 343 (6th Cir. 2005), *cert. denied*, 547 U.S. 1122 (2006); *United States v. Crumb*, 287 F. App'x 511, 514 (6th Cir. 2008) and additional cases cited therein. Thus, I **FIND** the odor of marijuana detected by Patterson when he leaned in Defendant's vehicle and Defendant's criminal history, which he falsely reported to Patterson as only including a DUI charge, generated the necessary reasonable suspicion to justify a brief detention for further investigation. Under such circumstances, a suspect may be briefly detained to investigate the suspicious circumstances.

Defendant argues Patterson's claim he smelled marijuana in the Tahoe is not credible for a number of reasons, including that Patterson never mentioned the smell of marijuana on the recording, he chose not to deploy his canine, he gave inconsistent testimony regarding whether the odor of marijuana was burnt or raw, the quantity of marijuana found on Defendant's person was quite small and Patterson testified he did not smell marijuana emanating from the Defendant – just the Tahoe, and there was no evidence of either burnt or raw marijuana found in the Tahoe. Patterson was not questioned about the possible reasons why he did not mention the marijuana odor to Defendant during the suppression hearing. However, Patterson's testimony indicates he saw no reason to deploy his canine since he detected the odor of marijuana himself. As to whether the marijuana odor was that of burnt or raw marijuana, it is troubling that Patterson appeared to be attempting to conform his testimony during the suppression hearing to his misreading of his

affidavit. However, he testified in both the state court proceeding and the suppression hearing that he smelled a marijuana odor coming from the Tahoe. In addition, in his affidavit he noted that he smelled an odor of marijuana. I **CONCLUDE** Patterson's inconsistent testimony regarding whether the marijuana odor was burnt or raw, while troubling, does not constitute such a material contradiction that it results in discrediting Patterson's testimony he detected an odor of marijuana. Therefore, upon consideration of all of the evidence, I credit Patterson's credible testimony he smelled an odor of marijuana in the Tahoe.

Accordingly, I **FIND** the circumstances known to Patterson reasonably aroused a suspicion criminal activity was afoot and he permissibly detained Defendant in order to more fully investigate the circumstances that provoked his suspicion. I also **FIND** the scope and length of the detention were reasonable given the totality of the circumstances. The diligence exhibited by Patterson reveals he did not unreasonably extend the detention of Defendant. The length of the delay in this case, of less than two minutes if measured from the time Patterson asked Defendant to exit the Tahoe to the time he determined Defendant attempted to flee and less than ten minutes if measured from the time of the initial stop until Defendant was in handcuffs, was not excessive under the circumstances. I **FIND** the United States has met its burden to show Patterson diligently pursued a means of investigation likely to confirm or dispel his suspicions quickly, his suspicions were reasonable, and the scope and length of the detention were reasonable given the totality of the circumstances. For these reasons, given the totality of the circumstances, I **FIND** the scope and duration of the detention did not transform this legal traffic stop into an unconstitutional seizure.

### D. Frisk and Search of Defendant

In *Johnson*, the Supreme Court again recognized traffic stops are "especially fraught with

danger to police officers," and that a driver may be patted down for weapons if the officer reasonably concludes the driver may be armed and dangerous. 2009 WL 160434 at *5 (citations omitted). *See also Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993); *Terry*, 392 U.S. at 30; *United States v. Strahan*, 984 F.2d 155, 158 (6th Cir. 1993). The standard for a warrantless patdown is whether the officer could "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21-22. "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence . . . ." *Dickerson*, 508 U.S. at 373 (citation omitted). *See also Adams v. Williams*, 407 U.S. 143, 146 (1972) (officer may conduct a limited protective search for concealed weapons when he "is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others") (internal quotation marks and citation omitted)). The officer need not be certain a defendant is armed. The issue is whether a prudent person in the circumstances would be warranted in the belief his or her safety or that of others was in danger. Thus, the general test is whether the surrounding circumstances give rise to a justifiable fear for personal safety. *Garza*, 10 F.3d at 1246.

I **FIND** the circumstances at issue, which include Patterson's awareness of Defendant's prior arrest on assault, drug and fleeing charges, his detection of the odor of marijuana, Defendant's bloodshot eyes, and Defendant's nervousness meet this test and the patdown was reasonable under the circumstances. Once Patterson detected the unknown hard object, he was justified in requiring Defendant to empty his pocket entirely. I **FIND** it was reasonable for Patterson to require Defendant to empty his pocket because the Defendant continued to "dig" in his pocket after removing his cell phone and a reasonable officer in the surrounding circumstances could continue to have a justifiable

25

fear for personal safety.

In case the Court rejects the above finding, I will briefly address the issue of the contraband located in Defendant's pocket. If an officer discovers nonthreatening contraband during a patdown, he may seize the contraband, providing it was immediately recognized through the officer's patdown of the defendant's outer clothing. *Dickerson*, 508 U.S. at 375 (plain view doctrine "has an obvious application by analogy to cases in which an officer discovers contraband through the sense of touch during an otherwise lawful search"); *United States v. Walker*, 181 F.3d 774, 778 (6th Cir. 1999) (police may seize non-threatening contraband detected by touch during a protective patdown search if the search stays within the bounds marked by *Terry*). Patterson's affidavit does not mention his detection of a baggie during the patdown of Defendant. The affidavit instead reflects he detected the baggie with potential marijuana when he saw the baggie as Defendant pulled his hand up after being ordered to remove everything from his pocket. Patterson testified he felt one unknown hard object and a probable plastic baggie with something in it in Defendant's right front pocket, but he was never asked whether he recognized the probable baggie as contraband or even whether he knew if drugs were typically packaged in such baggies. As the United States offered no testimony to demonstrate Patterson immediately recognized the object as contraband, I **FIND** the United States did not meet its burden of proof to demonstrate Patterson detected contraband during the patdown of Defendant.

     E.     **Search of Defendant's Vehicle**

Although searches must normally be conducted pursuant to a warrant, under the well-known automobile exception, a warrantless search of a vehicle that has been stopped lawfully is permissible if the search is based upon probable cause. *United States v. Ross*, 456 U.S. 798, 823 (1982); *United*

*States v. Pasquarille*, 20 F.3d 682, 690 (6th Cir. 1994). As noted above, the Sixth Circuit has repeatedly held that the detection of a narcotic odor from within a vehicle is sufficient probable cause to search without a warrant. *See e.g., Foster*, 376 F.3d at 589; *United States v. Garza,* 10 F.3d at 1246; *Puckett*, 422 F.3d at 343; *Crumb*, 287 F. App'x at 514.

In addition, one of the well-established exceptions to the warrant requirements of the Fourth Amendment is a search incident to arrest. *See e.g.*, *Michigan v. DeFillippo*, 443 U.S. 31, 35 (1979); *Chimel v. California*, 395 U.S. 752, 762-63 (1969). "[W]hen a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." *United States v. Byrd*, No. 94-5301, 1995 WL 72299, *5 (6th Cir. Feb. 21, 1995) (quoting *New York v. Belton*, 453 U.S. 454, 460 (1981)). Such a search may be made without a warrant or probable cause. *Id.* (quoting *United States v. Thomas*, 11 F.3d 620, 628 (6th Cir. 1993)).

I **FIND** the search of the Tahoe was proper as either a search supported by probable cause due to the detection of a narcotic odor or as a search incident to arrest based upon the marijuana in Defendant's pocket.

### F.     Statements

It is well established "incriminating statements elicited from suspects in custody cannot be admitted at trial unless the suspect was first advised of his or her Miranda rights." *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998) (citing *Stansbury v. California,* 511 U.S. 318, 322 (1994)). "Custodial interrogation" has been defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The Supreme Court explained in

*Rhode Island v. Innis*, the "definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." 446 U.S. 291, 301-02 (1980) (emphasis in original). "Interrogation" includes both express questioning and its "functional equivalent," which includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301.

The statements Defendant seeks to suppress are reflected in the recorded evidence as: 1) "I got something in the car, man" or "I have dope in the car, man" and 2) "drugs." Defendant argues these statements were protected by the Fifth Amendment and were taken in violation of his Miranda rights. The United States argues the circumstances in which Defendant's first statement was made do not constitute a "custodial interrogation," but also concedes the second statement (*i.e.*, "drugs") was made in response to custodial interrogation and will not be used in the United States' case-in-chief. The parties agree Defendant was not given a Miranda warning prior to making the statements at issue and he was in custody at the time he made the statements. What is in dispute is whether Defendant was subject to custodial interrogation.

When determining whether police activity constitutes interrogation of a suspect in custody within the meaning of *Miranda*, "courts should carefully scrutinize the factual setting of each encounter of this type." *United States v. Avery,* 717 F.2d 1020, 1025 (6th Cir. 1983). Even if a defendant is in custody and has not been given the Miranda warnings, his statements are admissible if they are volunteered. *United States v. Jones*, 128 F. App'x 490, 494 (6th Cir. 2005); *United States v. Crowder*, 62 F.3d 782, 786 (6th Cir. 1995) (citing *Oregon v. Elstad*, 470 U.S. 298*,* 307-09 (1985)).

28

In looking at the overall context of the first statement, I **FIND** the Defendant's statement was neither voluntary nor spontaneous. Defendant was asked why he was "going to try to run" and told he would get another taser shock if he did not turn over in very close proximity to his statement. Patterson's question of why the Defendant was going to run, although not posed immediately prior to the response at issue, constituted custodial interrogation under the circumstances. By the time Patterson made the statement at issue he had been incapacitated by taser shocks six times for his failure to fully comply with various commands and had fallen on his head twice. After considering the entire factual setting, I **CONCLUDE** both statements should be suppressed.

## IV. Conclusion

For the reasons set forth above, I **RECOMMEND**[5] that Defendant's motion [Doc. 9] be **GRANTED IN PART and DENIED IN PART** as follows: 1) the aspect of Defendant's motion which seeks to suppress the two statements identified herein should be **GRANTED** and 2) all other aspects of the motion should be **DENIED**.

s/*Susan K. Lee*

SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[5] Any objections to this report and recommendation must be served and filed within ten days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).